UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MATTHEW J. LOLO,

                                                            **DECISION AND ORDER**
                                                                   15-CV-0625-A

                                    Plaintiff,

            v.

CAROLYN W. COLVIN,
ACTING COMMISSIONER
OF SOCIAL SECURITY,

                                    Defendant.

_____

        Matthew J. Lolo ("Plaintiff"), who is represented by counsel, brings this

action pursuant to the Social Security Act ("the Act"), seeking review of the final

decision of the Commissioner of Social Security ("the Commissioner") denying

Plaintiff's application for Disability Insurance Benefits ("DIB"). The Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).

        Presently before the Court are the parties' motions for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt.

Nos. 5, 6.  For the reasons that follow, the Commissioner's motion is granted.

## BACKGROUND

        ***Procedural History.***  Plaintiff filed an application for DIB on October 9,

2012, alleging disability beginning December 18, 2011, due to herniated lumbar

discs, lower back pain, cervical disc problems, and a torn right rotator cuff. T. 20,
144-48, 168.[1] His initial application was denied, and a hearing followed before
Administrative Law Judge ("ALJ") Donald McDougall on January 13, 2014. T. 37-
81, 102-03.  Vocational Expert ("VE") Gil Pearson also appeared at the hearing.
T. 37, 113-17. After the ALJ issued a decision finding that Plaintiff was not
disabled, Plaintiff requested Appeals Council review of the hearing decision. T. 1-
5, 14, 20-32. On June 5, 2015, the Appeals Council denied Plaintiff's request,
and the ALJ's determination became the Commissioner's final decision. This
action followed. Dkt. No. 1.

*The ALJ's Decision.*  In applying the familiar five-step sequential analysis,
as contained in administrative regulations promulgated by the Social Security
Administration ("SSA"), *see* 20 C.F.R. §§ 404.1520, 416.920; *Lynch v. Astrue*,
No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the
five steps), the ALJ found: (1) Plaintiff did not engage in substantial gainful
activity from his alleged onset date of December 18, 2011 through his date last
insured of December 31, 2013; (2) he had the severe impairments of cervical
disc herniation; lumbar disc herniation; and partial right rotator cuff tear; and (3)
his impairments did not meet or equal the Listings set forth at 20 C.F.R. § 404,
Subpt. P, Appx. 1. The ALJ found that Plaintiff retained the residual functional
capacity ("RFC") to perform a range of light work with the limitations of not
bending over 45 degrees and occasional bending to 45 degrees; a sit/stand

---

[1]  Citations to "T.__" refer to the pages of the Administrative Transcript.

option every 30 minutes, for a few minutes; no ladders, ropes, scaffolds, stairs, or ramps; avoiding heights; occasional balancing, stooping, kneeling, crouching, or crawling; and no overhead work; (4) Plaintiff could not perform his past relevant work; and (5) if Plaintiff had the RFC for a full range of light work, the Grids[2] would direct a finding of "not disabled," however, Plaintiff's additional limitations impeded his ability to perform all or substantially of the requirements of light level work. The ALJ noted the VE testimony that there were jobs that existed in significant numbers which could be performed by a person of Plaintiff's age, education, vocational background, and RFC, such as cashier, sales attendant, order clerk, and charge account clerk. The ALJ concluded that Plaintiff was not disabled under the Act. T. 20-32.

## DISCUSSION

***The Scope of Review.*** A federal court should set aside an ALJ's decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

---

[2] "The Grids," or the Medical Vocational Guidelines, divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. § 404, Subpt. P, Appx. 2. Each category has its own Grid which takes into account the claimant's age, education, and work experience. Based on these factors, the Grids indicate whether the plaintiff can engage in any other substantial gainful work which exists in the national economy.

***Medical Evidence.***  On December 18, 2011, Plaintiff was involved in a motor vehicle accident and was treated at Niagara Falls Medical Center two days later upon complaints of aching pain to the back and neck of 5/10 severity. X-rays revealed intact right shoulder, unremarkable views of the cervical spine, and mild L5-S1 disc narrowing with otherwise normal lumbosacral spine. Plaintiff was diagnosed with cervical strain (whiplash) and shoulder strain, given Flexeril and Motrin, and was discharged. T. 225-27.

Between December 21, 2011 and January 9, 2014, Plaintiff received chiropractic care one to two times per week. Douglas Monteleone, D.C., diagnosed Plaintiff with neck sprain, cervicobrachial syndrome (diffuse), cervicocranial syndrome, thoracic sprain, and lumbar sprain. Plaintiff tested positive for myofascitis. No significant changes were reported during this course of treatment. Plaintiff continued to report pain in his legs, back, and arms, with temporary relief from chiropractic care. He declined treatment by prescription drugs. By January 9, 2014, Plaintiff's prognosis was guarded and uncertain, with a chance that he would need long-term treatment. T. 306-25, 354-87, 418-72.

Between January 12, 2012 and June 5, 2012, Plaintiff received massage therapy two to three times per week. Plaintiff continuously reported headaches and pain in his back, shoulders, and neck, sometimes radiating to his legs. Notes from Massage Center of Niagara indicate that his pain level generally decreased over time with occasional spikes, ranging from 1/10 to 7/10 in severity. T. 239-77.

On January 23, 2012, Plaintiff was examined by orthopedic surgeon William Wind, who noted no tenderness and full strength and range of motion in the neck; crepitation of the right shoulder with some tenderness but no obvious instability; normal strength in the right shoulder with full range of motion and pain at the extremes. Dr. Wind assessed sprains and strains to the shoulder, tendinitis of the biceps, and possible partial tear. Physical therapy was recommended. T. 236-37.

A February 7, 2012 magnetic resonance imaging ("MRI") of the cervical spine showed concentric bulging of the disc and annular tears at the C5-6 level without evidence of cervical disc herniation or cervical spinal stenosis or cervical cord compression. The C2-3 and C3-4 levels, C6-7 and C7-T1 levels, cervical cord and craniocervical junction, and paravertebral soft tissues were normal or unremarkable. No fracture or dislocation was identified. T. 280.

On February 27, 2012, Dr. Wind noted that Plaintiff was attending physical therapy and reported "significant improvement in his pain over the anterior aspect of his shoulder." T. 234. Physical examination was normal except for crepitation of the right shoulder with mild tenderness over the right bicipital groove and greater tuberosity, a positive Hawkins impingement sign, positive Neer impingement test, and painful arc of motion. Plaintiff was to continue physical therapy and keep up with home exercises, avoiding aggravating activities. T. 234-35. Notes from a follow-up appointment on April 2 show similar complaints of pain, similar physical examination findings, and an assessment of shoulder

sprain and strain and bursae and tendon disorder shoulder region. Physical therapy and home exercise were again recommended. T. 233-34, 399-400.

Plaintiff saw orthopedic surgeon Franco Vigna on August 2, 2012 for a consultation where Plaintiff reported neck pain at 3 to 4/10 and low back pain at 7/10, mild right shoulder pain, and tingling and numbness in his right hand. He also reported right leg pain that was not as severe. Chiropractic care helped relieve his pain. As a self-employed landlord, Plaintiff had to hire help to perform maintenance and upkeep on his property that he was unable to perform himself since his accident. Examination revealed negative impingement sign in the shoulders, negative straight leg raises, and decreased sensations in C6, C7, and C8 dermatomes on the right.

Dr. Vigna noted that a May 10, 2012 MRI of the lumbar spine showed small, right paracentral, subligamentous L5-S1 disc herniation indenting the anterior aspect of the thecal sac, and left far lateral L4-5 disc herniation projecting into the left L4-5 neural foramen. T. 281. Reviewing a June 2, 2012, imaging test of the lumbar spine, Dr. Franco Vigna assessed mild disc space narrowing at L4/L5 and mild degenerative change at L1/L2, with no compression fracture, spondylolisthesis or spondylolysis. T. 282.  Imaging of the lumbosacral spine dated August 2, 2012 produced identical results, and x-rays of the cervical spine were normal. T. 223, 304.

Following a review of the current and previous diagnostic imaging tests and a physical examination, Dr. Vigna assessed Plaintiff with cervical disc

protrusion, lumbar disc herniation, radiculopathies in the arms and legs with weakness, displaced disc herniation without myelopathy, and displaced cervical disc without myelopathy. Plaintiff was to continue physical therapy and chiropractic treatment with potential lumbar epidural injections if he continued to have pain. T. 283-86.

In September, 2012, Dr. Monteleone, Plaintiff's regular chiropractor, completed a review of his treatment over the past nine months, noting that Plaintiff's visits increased from two to three times per week due to ongoing high pain levels. He further noted that Dr. Cardamone's report from May 29, 2012, was erroneous with respect to Plaintiff's arm, and that Plaintiff regularly complained of symptoms in his right shoulder, arms, and fingers. Plaintiff further complained of moderate to severe lower back pain with radiation into the legs. Dr. Monteleone's physical examination revealed limited range of motion in the lumbar and cervical spine, spasm in the cervical lumbar spine upon palpation, negative straight leg raise test, mild weakness in the bicep of the right arm with upper extremities otherwise normal, and positive Kemp's test. He reviewed Plaintiff's imaging tests and diagnosed him with ongoing sprain/strain whiplash type injury to the cervical spine, with associated cervical discopathy and annular tears and cervical brachial syndrome; lumbar sprain/strain; and herniation in the lumbar spine resulting in radicular syndrome to the legs. The chiropractor opined that further resolution of Plaintiff's symptoms may be minimal, and the prognosis

at that time was guarded. Plaintiff was assessed with a temporary, moderate to severe overall disability. T. 350-51.

A New York Motor Vehicle No Fault Insurance Law Denial of Claim Form dated November 15, 2012, stated that Plaintiff's benefits for chiropractic and massage therapy were denied as of June 1, 2012. This determination was based on the results of a health service examination by chiropractor Michael Cardamone, D.C., on May 29, 2012, indicating that such treatment was no longer necessary for the injuries sustained in Plaintiff's December, 2011, car accident. T. 341-44.

Dr. Monteleone completed a Range of Motion Chart Functional Assessment on November 18, 2012, which concluded that Plaintiff was limited in his ability to push and/or pull with his arms and could not climb ladders. T. 347.

Plaintiff was consultatively examined by Donna Miller, D.O., on December 7, 2012. His chief complaints were chronic neck and lower back pain, and right shoulder partial rotator cuff tear since his motor vehicle accident. He was not on any medications and reported drinking alcohol once per month and marijuana use since age nine with current use a few times per week. He lived alone and cooked and cleaned daily, did laundry, shopped, showered, and dressed himself. His hobbies were watching TV, listening to the radio, and rescuing homeless animals. Physical examination revealed difficulty walking on toes and a 25% of full squat, and some reduced range of motion in the cervical spine, lumbar spine, and hip. Plaintiff was diagnosed with chronic neck pain; bulging cervical disc;

chronic lower back pain; history of partial right rotator cuff tear; and headaches. His prognosis was stable and the consultative examiner concluded that Plaintiff had mild limitations in heavy lifting, bending, carrying, reaching, pushing, and pulling. T. 388-91.

Social Security Form DDD-3883 was completed on December 11, 2012, by Dr. Wind with respect to Plaintiff's shoulder. Diagnosis was tendinitis of the biceps and subscapularis tendon and subacromial impingement of the right shoulder. Current symptom was pain, treatment was physical therapy, and prognosis was rated as good. Dr. Wind opined that Plaintiff was limited in lifting and overhead activities. T. 392-98.

On October 28, 2013, Dr. Monteleone completed a Patient Evaluation/Management Form which noted ongoing neck, back, and extremity pain, including right and left hand and finger tingling. Diagnoses were lumbar disc displacement; lumbosacral neuritis, NOS; cervical disc displacement; and brachial neuritis, NOS. The doctor assessed that progress was slower than expected due to chronicity, overuse, and instability. A treatment plan of one to two visits per week for 10 weeks was indicated, and recommendations were ice, heat, walking, and neck and back exercises at home. T. 428-30.

In a letter dated January 10, 2014, Dr. Monteleone opined that Plaintiff had an ongoing sprain/strain; whiplash-type injury to the cervical spine, with associated cervical discopathy and annual tears; cervical brachial syndrome; and a lumbar spine sprain/strain with disc herniation resulting in radicular syndrome

to the legs. According to the chiropractor, Plaintiff had a moderate to severe disability in the lumbar spine, moderate to severe disability in the cervical spine, and moderate to severe overall disability. His prognosis was fair to guarded, and he was precluded from engaging in substantial gainful employment since December 21, 2011. T. 474.

On January 30, 2014, Dr. Monteleone completed a Medical Assessment of Ability to Do Work-Related Activities, and opined that Plaintiff could occasionally lift/carry five pounds and frequently lift two pounds. In an eight-hour workday he could stand/walk continuously for five minutes and for a total of one hour; sit continuously for 15-20 minutes and for a total two to three hours. Plaintiff could never climb, balance, kneel, or crawl, and occasionally stoop or crouch. His abilities in reaching, handling, and feeling were affected, and should be restricted from exposure to heights, temperature extremes, dust, fumes, and vibrations. His impairments also affected his general mental capacity and emotions on a daily basis. Plaintiff required four 30-minute breaks in a standard workday. The chiropractor concluded that Plaintiff was unable to engage in substantial gainful employment. T. 476-78.

***Non-Medical Evidence.***  On November 26, 2012, Plaintiff completed a Function Report. Plaintiff drove his daughter to soccer and karate four to five times a week, and cared for his nine cats. Sometimes he had to sit when dressing, and would have to use his arms to push himself up out of the bathtub. He had no difficulties shaving, feeding himself, or using the bathroom. He

prepared his own meals, but was unable to "clean for long period[s]" and needed help with yard work due to his back pain T. 185. He was able to walk, drive, and go out alone. Plaintiff shopped for about 20 minutes once per week. He socialized by phone, online, in person on a daily basis. He was no longer able to exercise or play sports. Although Plaintiff could lift, he could not do so for long periods or consistently. Plaintiff could stand for 20-60 minutes before needing to sit, and walk for 15-20 minutes before needing to rest for one to two minutes. Climbing stairs was "very hard." T. 188. He was unable to kneel and his right side would hurt and "give out" when squatting. *Id.* He had no limitations in using his hands or reaching. Stress caused Plaintiff fatigue and anxiety. T. 182-90

   Plaintiff also completed a Pain Questionnaire, which indicated that he had experienced pain in his neck, shoulder and back, since December 18, 2011, which he described as pinching and stabbing. The pain radiated down the back of his head in to his neck, and down to his lower back and hip, and produced headaches. T. 191. Plaintiff reported that his shoulder pain was "better," his neck was "somewhat better except for headaches," and his back was "worse from non-treatment." *Id.* Running, walking upstairs, kneeling, and bending over would accelerate his pain. Plaintiff's back pain lasted all day. He took no medication, and stated that his pain was "depressing." T. 190-92.  An accompanying Headache Questionnaire indicated that Plaintiff saw a chiropractor twice a week. T. 192.

Plaintiff testified at his disability hearing in January, 2014, that he had problems bending over, headaches, and constant neck and lower back pain that radiated down his legs when he bent over. Initially, he treated with physical therapy, massage therapy, and chiropractic care. He also attended physical therapy three times a week for four or five months. At the time of the hearing, Plaintiff's only treatment consisted of chiropractic care and Motrin. Plaintiff told the ALJ that he would "not be walking very often," if he stopped his chiropractic care. T. 56. He also treated his back pain with ice, and stated that he did not take prescribed medication because it caused him to become disoriented, and muscle relaxers put him in a bad mood. He stopped seeing his orthopedist [Dr. Vigna] because he did not have insurance.

At the time of the hearing, Plaintiff's daily activities were checking on his rental properties and running errands for one to two hours. He hired someone to perform basic maintenance of his property. During the week, he would also drive his 12-year old daughter to karate and soccer practice. Plaintiff cooked, cleaned, did laundry, and shopped, but could not clean or do dishes for long periods of time. If he overexerted himself on a particular day, his back pain worsened the following day.

Plaintiff estimated that he could lift 10 or 20 pounds, but any more would cause pain in his legs or back. He could sit for 10 to 15 minutes before needing to change positions. He also testified that if he had to, he could sit for one to two hours, if he were allowed to "shift around in the chair." T. 47. Plaintiff could walk

15 to 30 minutes before experiencing back pain, and, depending on how his back felt on a particular day, he could stand for one to three hours. The level of his back pain varied from day-to-day. He also experienced numbness and tingling in his hand once or twice a month, which his chiropractor attributed to his neck and shoulder pain. Plaintiff testified to experiencing "excruciating headaches" once or twice per week T. 61. Plaintiff described his total pain level on an average day as 5 to 7/10. On bad days, his pain would be 7 to 8/10, once or twice per week. Plaintiff also had difficulty sleeping due to his pain one or two nights per week. During an eight-hour workday, Plaintiff estimated he would need to lie down for one to three hours to relieve his pain. T. 40-65.

Plaintiff last worked making heat and flame-resistant paints from 1997 to 2008. That job required him to lift 45-50 pound bags, shift 400-500 pound drums, load mills, and operate a forklift. He also managed a nightclub three days per week. He testified that he never had a problem with alcohol or illegal drugs. T. 50-53.

VE Gil Pearson also testified at the hearing. The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education, and work experience, who was able to perform light work with the following restrictions: he could never bend over 45 degrees and only occasionally bend up to 45 degrees; he would need the option to change between sitting and standing positions every 30 minutes, for a few minutes; he could not use ladders, ropes, scaffolds, stairs, or ramps, and must avoid heights; he could only occasionally balance, stoop,

kneel, crouch, or crawl; and he could never perform overhead work. The VE responded that jobs existed which such an individual could perform, specifically: cashier II, light work, with 817,195 positions nationally and 3,669 positions regionally; sales attendant, light work, with 2,475,636 positions nationally and 10,308 positions regionally; order clerk (food and beverage), sedentary work, with 11,418 positions nationally and 28 positions regionally; and charge account clerk, sedentary work, with 34,497 positions nationally and 160 positions regionally.

In response to questioning by Plaintiff's attorney, the VE stated that there was "potential" for erosion of the occupational base if the individual had to alternate positions at will, but the types of jobs he identified were "the types of unskilled jobs that really will accommodate that type of thing." T. 72. He went on to state that if an individual needed a sit/stand option four times per hour and would be off-task for more than nine or ten minutes per hour, that individual would not be able to maintain employment. T. 65-81.

**The Sufficiency of the Record.**   Plaintiff first contends that the ALJ was under a duty to develop the record more fully by requesting additional records from Advanced Care Physical Therapy.  Pl. Mem. (Dkt. No. 5-1) at 15. "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted). The ALJ's duty to develop the

record reflects "the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotation marks omitted); *see also Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits...."). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n. 5 (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

This point does not set forth a basis for remand. The present record is comprised of over 250 pages of medical records spanning a relevant time period of two-and-a-half years, including approximately 175 documented visits to Plaintiff's chiropractor alone. The record also includes treatment notes from Plaintiff's massage therapist, two orthopedists, a consultative examiner, hospital records, and MRI and other imaging reports.

During the hearing, the ALJ was made aware of the physical therapy records and he provided Plaintiff's representative 21 days to obtain them. T. 44, 81. Counsel submitted a letter to the ALJ 45 days later indicating that the records would not be submitted because Plaintiff was unable to afford the cost of obtaining the copies. T. 219.  Neither Plaintiff nor his counsel requested the ALJ's assistance in obtaining those medical records, *see Jordan v. Comm'r of Soc. Sec.*, 142 Fed.Appx. 542, 543 (2d Cir. 2005) (summary order) (finding that

the ALJ fulfilled his duty to develop the record where counsel volunteered to obtain documents from the plaintiff's treating physician; the ALJ kept the record open to allow counsel to submit the documents; counsel later advised that he had "nothing further to add"; and counsel did not request the ALJ to help him obtain the documents); and Plaintiff does not explain how the record is incomplete without them. *Cf. Apolito v. Astrue*, No. 11-CV-1065, 2012 WL 6787365, at *3-5 (N.D.N.Y. Nov. 5, 2012) (remanding for further development of the record where counsel could not obtain records from the plaintiff's psychiatrist, the ALJ did not make his own effort to obtain the records, and the records were "central to the disability determination"), *report and recommendation adopted*, 2013 WL 66706 (N.D.N.Y. Jan. 4, 2013). Under these circumstances, where the records were not central to the disability determination, and there were no gaps in the record as a whole, the ALJ was under no obligation to obtain the records on his own.

    ***The Opinion Evidence.***   Plaintiff next asserts that the ALJ's evaluation of opinion evidence of Drs. Monteleone and Miller was erroneous. Pl. Mem. at 16. In the written decision, the ALJ gave great weight to the opinion of the consultative examiner, and little weight to the opinion of Plaintiff's treating chiropractor.

    Chiropractors are typically not "acceptable medical sources" qualified to opine about the existence or non-existence of a disability, but they are "other sources" whose opinions can be considered in evaluating the severity of a

disability.  *See* SSR 06–03p, 2006 WL 2329939 (Aug. 9, 2006); *see also*

*Losquadro v. Astrue*, No. 11–CV–1798, 2012 WL 4342069, at *14 (E.D.N.Y.

Sept. 21, 2012) ("Although a chiropractor does not qualify as an 'acceptable

medical source' and thereby cannot establish a medical impairment, a

chiropractor is listed as an 'other source,' whose opinion should be considered in

step two of the analysis.").

In accordance with the regulations, ALJs are permitted to take a

chiropractor's opinion into account, though they are not required to do so. *See*

*Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995) (granting ALJs "discretion to

determine the appropriate weight to accord the chiropractor's opinion based on

all the evidence"). In determining how much weight to accord a chiropractor's

opinion, an ALJ may consider: (i) how long the source has known the plaintiff and

the frequency of treatment; (ii) how consistent the opinion is with other evidence;

(iii) the degree to which the source presents relevant evidence to support an

opinion; (iv) how well the source explains the opinion; (v) whether the source has

a specialty or area of expertise related to the individual's impairment; and (vi) any

other factors that tend to support or refute the opinion. *See* S.S.R. 06–03p.

In his decision, the ALJ noted Plaintiff's longstanding treatment relationship

with Dr. Monteleone, and reasoned that Dr. Monteleone's highly restrictive

opinion was inconsistent with the balance of the medical record, and with

Plaintiff's own testimony as to his limitations. T. 30. For example, the

chiropractor's opinion that Plaintiff could only frequently lift two pounds and

occasionally lift five pounds was contradicted by Plaintiff's hearing testimony that he could lift ten to 20 pounds. *Id.* The ALJ further noted that Dr. Monteleone's conclusion that Plaintiff was disabled was not entitled to any weight pursuant to SSR 96-5 (whether the claimant is disabled is  a determination reserved to the Commissioner). *Id.*  As observed by the ALJ, Dr. Monteleone's opinion was inconsistent with that of Dr. Miller, who found only mild limitations for heavy lifting, bending, carrying, reaching, pushing, and pulling, and treating orthopedist Dr. Wind, who opined that Plaintiff had no limitations in his abilities to lift, carry, stand, walk, sit, push, or pull. T. 391, 393-97. The ALJ did, however, incorporate into the RFC determination Dr. Monteleone's assessment of a restriction with regard to avoiding heights and/or ladders, thus partially crediting his opinion.

Although "chiropractors are not 'accepted medical sources' whose opinions are entitled to controlling or even special weight," an ALJ "may not flatly reject them without explaining his basis for doing so." *Nigro v. Astrue*, No. 10-CV-1431, 2011 WL 4594315, at *5 (E.D.N.Y. Sept. 30, 2011) (collecting cases). An ALJ has discretion to determine "[h]ow much weight to give" the opinions of a chiropractor, but "should consider the opinions" and "explain what weight he gives those opinions." *Id.* It is apparent from the record and the written opinion that the ALJ applied the correct legal standard in evaluating Dr. Monteleone's assessment of Plaintiff's limitations.

With regard to the ALJ's decision to afford Dr. Miller's opinion great weight, the Court notes that it "is not *per se* legal error for an ALJ to give greater weight

to a consulting opinion than a treating opinion." *Rivera v. Colvin*, 2015 WL 1027163 at *16 (S.D.N.Y. Mar. 9, 2015). When controlling weight is not afforded to the opinion of a treating physician, or when assessing a medical opinion from another source, such as a consultative examiner, the ALJ should consider the following factors to determine the proper weight to afford the opinion: (1) the source's examination relationship and treatment relationship with the plaintiff, including the length, nature, and extent of the treatment relationship, if applicable, (2) the opinion's supportability, (3) the opinion's consistency with the record as a whole, (4) the source's specialization, if any, and (5) other factors, such as the source's knowledge of disability programs and familiarity with the case record. 20 C.F.R. § 416.927(c); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (listing regulatory factors).

The ALJ's weight determination in this case was proper. He stated that the opinion of Dr. Miller was based on personal observations and examinations, and was supported by the relatively mild clinical abnormalities on physical examination. He further noted that Dr. Miller was familiar with Social Security's rules and regulations regarding physical impairments and disabilities. T. 30. Significantly, Plaintiff overlooks the fact that the ALJ also afforded great weight to the opinion of Dr. Wind, Plaintiff's treating orthopedist, whose opinion that Plaintiff would have limitations in lifting and overhead activities, but no other limitations with regard to his right shoulder, was *less* restrictive than Dr. Miller's. T. 30, 396. Accordingly, the ALJ applied the proper legal standard and

substantial evidence supports the weight he assigned to the medical opinions in this case.

*Listings (Step Two).* Plaintiff next argues that the ALJ erred in finding that his headaches were a non-severe impairment at step two of the sequential analysis. Pl. Mem. at 19.

Under the regulations, "[a]n impairment or combination of impairments is not severe if it does not significantly limit a [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). The regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," with examples including the following: (1) physical functions such as walking, standing, lifting, pushing, pulling, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervisors, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).  Accordingly, the severity of an impairment is determined by the limitations imposed by the impairment, and not merely by diagnosis of the impairment. *Ellis v. Comm'r*, 11-CV-1205, 2012 WL 5464632, at *4 (N.D.N.Y. Sept. 7, 2012) (citing *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).

Step two of the disability review analysis may do nothing more than screen out *de minimus* claims, *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), and a finding of a non-severe impairment should be made only where the medical

evidence establishes only a slight abnormality which would have no more than a minimal effect on the claimant's ability to work. *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. March 19, 1999) (quoting SSR 85-28, 1985 WL 56856). When an ALJ finds that one or more of a plaintiff's impairments are severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the five-step analysis and did not deny the claim based on lack of a severe impairment alone. *Ellis*, 2012 WL 5464632, at *5.

Plaintiff cites to various references in the record to his complaints of headaches. Pl. Mem. at 20. This, however, is insufficient to mandate a finding that the condition is a severe impairment. *See Ellis*, 2012 WL 5464632, at *4. Although Plaintiff was diagnosed with headaches by Dr. Miller, and he complained of headaches to his massage therapist and his chiropractor, there is nothing in the record that suggests that his ability to do any basic work activities would be severely compromised due to the presence of headaches. To the contrary, Plaintiff's Headache Questionnaire was mostly incomplete and only specified that he saw a chiropractor two times per week, that he underwent a pro scan imaging test, and that he did not keep a headache diary. No questions were answered relating to the frequency or severity of his headaches, or the functional limitations associated therewith. T. 193. The step two determination involves the presence of functional limitations, an element that was not established by the evidence of record with respect to Plaintiff's headaches. *See* SSR 85-25 ("The

severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs . . . . Thus, these basic work factors are inherent in making a determination that an individual does not have a severe medical impairment.")

*Credibility Assessment of Plaintiff.*  The Plaintiff also contends that the credibility assessment of the ALJ was not supported by substantial evidence. Pl. Mem. at 20-23.  It is well-settled that to establish disability, there must be an underlying physical or mental impairment demonstrated by clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptoms alleged. *See* 20 C.F.R. § 416.929(b); *Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir. 1983). When such an impairment exists, objective medical evidence, if available, must be considered in determining whether disability exists. *See* 20 C.F.R. § 416.929(c)(2). Where a plaintiff's symptoms suggest an even greater restriction of function than can be demonstrated by the medical evidence, the ALJ may consider factors such as his daily activities, the location, duration, frequency and intensity of pain, any aggravating factors, the type, dosage, effectiveness, and adverse side-effects of medication, and any treatment or other measures used for pain relief. S*ee* 20 C.F.R. § 416.929(c)(3); SSR 96–7p (July 2, 1996), 1996 WL 374186, at *7. It is well within the ALJ's discretion to evaluate the credibility of a plaintiff's testimony and assess, in light of the medical findings and other evidence, the true extent of her symptoms. *See Mimms v.*

*Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Gernavage v. Shalala*, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

Here, the ALJ determined that Plaintiff's subjective complaints were not fully credible and the objective medical evidence did not support the alleged severity of symptoms. T. 30. In doing so, he considered Plaintiff's activities of daily living (cooking, cleaning, laundry, shopping, driving, going out alone, and taking care of nine cats), Plaintiff's statements regarding his pain improving in his shoulder, and the inconsistencies in his testimony regarding illegal substance abuse. T. 29. The ALJ further discussed the conservative nature of Plaintiff's treatment, consisting only of chiropractic care and over-the-counter medications. *Id.* Finally, he noted that objective medical evidence did not support limitations beyond the RFC determination. *Id.* He also discussed Plaintiff's pain in conjunction with the objective medical evidence, the hearing testimony, and the RFC assessment. *Id.*

The ALJ employed proper standard in assessing Plaintiff's credibility and cited the relevant authorities in that regard, *see, e.g., Britt v. Astrue*, 486 Fed. Appx. 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility), and substantial evidence supports his determination. Credibility findings of an ALJ are entitled to deference, therefore the Court sees no reason to disturb the ALJ's credibility finding in this case. *See Salmini v. Comm'r of Soc. Sec.*, 371 Fed.Appx. 109, 113 (2d Cir. 2010) ("[i]t is

the function of the ALJ, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.") (internal quotation omitted).

*Impairments.*  Plaintiff argues that the ALJ improperly considered the combination of exertional and non-exertional impairments which render him disabled. Pl. Mem. at 23.  At the outset, to the extent Plaintiff re-asserts that the ALJ erroneously found that Plaintiff's headaches were non-severe and improperly evaluated Plaintiff's credibility, Pl. Mem. at 24-25, the Court has already considered and rejected those contentions.

The Court also disagrees that the ALJ improperly considered Plaintiff's impairments and limitations. Pl. Mem. at 25. The ALJ found that Plaintiff's cervical disc herniation, lumbar disc herniation, and partial right rotator cuff tear were severe impairments, which limited Plaintiff in his abilities to, *inter alia*, stoop, kneel, crouch, work at heights, or overhead. T. 24. In determining Plaintiff's limitations, the ALJ clearly took into consideration Plaintiff's complaints of pain in his back and shoulder, noting that, "mild to moderate pain or discomfort is not, in itself, incompatible with the performance of sustained work activity." T. 29. The Court finds that Plaintiff has submitted no evidence (as is his burden) showing that he had any additional impairments that were severe or caused functional limitations that precluded him from performing substantial gainful activity.

*The VE Testimony (Step Five).*  Plaintiff concludes his appeal by arguing that the hypothetical posed to the VE by the ALJ was not supported by substantial evidence upon which the ALJ could rely.  Pl. Mem. at 25-28.

The Court finds that the above-discussed RFC is supported by substantial evidence and thus concludes that the ALJ's step five analysis is also supported by substantial evidence. *See Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 229 (N.D.N.Y. 2015) ("The Second Circuit has stated that there must be 'substantial record evidence to support the assumption upon which the vocational expert based [her] opinion.") (alteration in original) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)). Although Plaintiff urges the Court to revisit the ALJ's weight determination with respect to the opinion of chiropractor Dr. Monteleone, *see* Pl. Mem. at 28, it has been previously discussed that the limitations ascribed to Plaintiff by Dr. Monteleone were not supported by the balance of the medical evidence and Plaintiff's own testimony. The additional limitations discussed in Plaintiff's brief (absence from work more than one day per month and remaining off-task more than nine minutes per hour), were not part of the RFC as determined by the ALJ and therefore were not considered as part of the step five determination. To the contrary, the VE testified that the unskilled, light and sedentary jobs he presented with respect to Plaintiff's RFC would typically accommodate a sit/stand option, stating that changing positions "usually . . . every half hour . . .  is tolerable by employers." T. 72.

"Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony." *Hamilton*, 105 F. Supp. 3d at 229 (citing *Dumas*, 712 F.2d at 1554 n.4). Here, however, the ALJ posed hypothetical questions that fully captured Plaintiff's RFC. T. 31-32.  Accordingly, this Court finds that the ALJ's step five analysis was proper and free from error.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion for judgment on the pleadings (Dkt. No. 5) is denied, and the Commissioner's cross-motion (Dkt. No. 6) is granted. The complaint is dismissed in its entirety with prejudice.  The Clerk shall enter Judgment accordingly.

**SO ORDERED.**


        s/*Richard J. Arcara*
        HONORABLE RICHARD J. ARCARA
        UNITED STATES DISTRICT JUDGE

DATED:   January 10, 2017